IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| ERICA JOHNSON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-651 (RDA/IDD) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on the Government's Motion to Dismiss (the "Motion") (Dkt. 26). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter is fully briefed and ripe for disposition. Considering the Amended Complaint (Dkt. 24), Defendant's Memorandum in Support (Dkt. 27), Plaintiff's Opposition (Dkt. 31), and Defendant's Reply (Dkt. 37), this Court GRANTS the Motion for the reasons that follow.

I. BACKGROUND

A. Factual Background[1]

Plaintiffs Erica Johnson, Leah Olszewski, and Elizabeth Knight were all victims of domestic violence at the hands of their ex-partners, all of whom were members of the military. Dkt. 24 ¶ 8. On September 7, 2021, CBS News published a report regarding domestic violence within the military in which all three Plaintiffs' stories were highlighted. *Id.* ¶ 9. Each Plaintiff described the abuse she suffered and the difficulties she encountered with the Air Force and Army

---

[1] For purposes of considering the Motion to Dismiss, the Court accepts all facts contained within the Amended Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

1

investigating the abuse and holding her abuser accountable. *Id.* Each Plaintiff was visibly shaken

and emotional in recounting this information, at times finding it difficult to speak through  tears.

*Id.*

In an almost immediate response to CBS's comprehensive report and interviews with

Plaintiffs, Former Air Force Secretary Frank Kendall, III ("Secretary Kendall"), whose office was

in the Pentagon, wrote to CBS:

> I am extremely troubled by the claims of inappropriate handling of domestic
> violence complaints highlighted in your broadcast and have directed the
> Department of the Air Force Inspector General to conduct a comprehensive review
> of those cases. The review will address not only the investigation and disciplinary
> actions associated with these cases, but also the support provided to victims. There
> is absolutely no place for sexual assault, sexual harassment, or domestic violence
> in the Department of the Air Force.

*Id.* ¶ 10.  Former Secretary of Defense Lloyd Austin ("Secretary Austin") also provided a written

response to CBS, in which he stated:

> Sexual assault, sexual harassment and domestic violence continue to plague our
> ranks. These crimes have profoundly damaging, and sometimes lethal
> consequences for service members and our families, and fundamentally impact our
> combat readiness. While I cannot comment on individual cases, I take these issues,
> and the impact on the men and women of the services, and their families, with the
> utmost seriousness. One of my early actions as Secretary of Defense was the
> establishment of an Independent Review Commission on sexual assault and
> harassment in the military. In July this year, the Commission made 82
> recommendations addressing accountability; prevention; climate and culture; and
> victim care and support. So here's what we're doing. First and foremost, we are
> working closely with Congress on legislative proposals to remove decisions about
> whether to prosecute sexual assaults and related crimes-including domestic
> violence-from the military chain of command. Second, the Department will create
> dedicated offices within each service to handle these specific crimes. Third, we
> have asked Congress to formally add sexual harassment as an offense under the
> Uniform Code of Military Justice. Finally, my team and I are reviewing an
> implementation roadmap for the many other thoughtful recommendations included
> in the [Independent Review Commission's] report.
>
> Taken together, these are among the most significant reforms to our military in
> decades. Additionally, I have directed immediate steps across the Department to
> understand what is happening at the installation and unit level. We are assessing

compliance with sexual assault and harassment policies and visiting bases around the world that are either showing promise to identify solutions or illuminate bright spots and export best practices. We continue to focus intensively on increasing prevention efforts, training, and streamlining and improving accountability mechanisms. And as always, we continue to focus on the care and support we offer victims. The women and men of our armed forces dedicate their lives to defending our nation, and deserve a workplace and home free of sexual assault, sexual harassment and domestic violence.

President Biden has placed an unprecedented priority on tackling this problem, and we've moved out quickly and deliberately to address it. I believe that bold action, commitment, and accountability are required, and that is exactly what we have, and will continue, to do. This is not a short-term problem and will not be solved by short-term strategies. It requires sustained action and commitment at the highest level of the Department of Defense - every commander, civilian leader, and member of the force must be a necessary part of the solution. Our people and our readiness are inextricably linked. These crimes endanger both. We find that unacceptable, and we aren't afraid to change what we do, how we prosecute and how we better prevent them. This is a leadership issue, and we will lead.

*Id.* ¶ 11.

Following CBS's reporting, Plaintiff sent a letter to Secretary Kendall asking that he honor the promises made in his statement to CBS. *Id.* ¶ 12. Plaintiffs Johnson and Knight also had a call with Secretary Kendall on or about October 3, 2021, regarding his assurances. *Id.* ¶ 12. Plaintiff Olszewski had a separate prior call with Secretary Kendall. *Id.*

On January 25, 2023, Secretary Kendall issued an All Force Message to publicly announce that he had ordered an investigation in September 2021 into the "improper handling of three domestic violence incidents." *Id.* ¶ 22. The All Force Message did not mention the criminal aspect of the incidents, instead it said:

There is no place in our Air and Space Forces for domestic violence or interpersonal violence in any form. While we have taken important steps to better support domestic violence survivors, we must do more to establish a foundation of trust, integrity, and respect that encourages reporting and engenders confidence in our enterprise.

*Id.*   Plaintiff Erica Johnson's case and Plaintiff Leah Olszewski's case were two of the three referenced domestic violence incidents.  *Id.* ¶¶ 22, 34.

i.  Facts Specific to Plaintiff Erica Johnson

Plaintiff Johnson was physically abused, sexually abused, and stalked—in direct violation of a lawful restraining order—by her ex-husband, who, as of the filing of the Amended Complaint, is a Senior Master Sergeant in the Air Force ("SMSgt Doe").  *Id.* ¶ 13.  Johnson reported the abuse to the Air Force in 2018, and an Air Force Office of Special Investigations ("AFOSI") investigation was opened in July 2019.  *Id.* ¶ 14.  Notwithstanding several instances of domestic assault, the AFOSI solely focused its investigation on a singular May 2019 incident during which SMSgt Doe sexually assaulted and strangled Johnson.  *Id.*

Johnson had previously obtained a Civilian Protective Order against SMSgt Doe after a trial before a local judge.  *Id.* ¶ 16.  And Johnson provided the AFOSI over 1,000 messages, pictures depicting the physical injuries suffered, voice recordings wherein SMSgt Doe admitted to and apologized for the abuse, emails, and other documents.  *Id.* ¶ 15.  Despite this evidence, the Air Force took no further action against SMSgt Doe.  *Id.* ¶ 16.  Instead, the AFOSI undertook an investigation into Johnson, who was also a Master Sergeant in the Air Force at the time and was suffering from great emotional trauma due to the assaults.  *Id.* ¶ 15.  Johnson was ultimately medically retired.  *Id.* ¶ 16.

Following the CBS report, Secretary Kendall publicly informed CBS that a comprehensive Inspector General review would address the original criminal investigations and disciplinary actions.  *Id.* ¶ 17.  He reiterated the same to Johnson during a subsequent phone call.  *Id.*  Johnson therefore believed the Air Force was simply re-reviewing the prior investigation and all evidence previously provided to the AFOSI, the Air Force Legal Advocate for the respective Air Force Base,

4

two Special Victims Counselors, and her chain of command.  *Id.* ¶ 18.  However, the investigation was reopened as opposed to re-reviewed.  *Id.*  Given the trauma she suffered from the first investigative process and multiple death threats, acts of intimidation, and protective order violations by SMSgt Doe during the initial investigation, Johnson did not want the investigation re-opened.  *Id.*

The AFOSI then claimed that it reviewed, for the first time, the inculpatory recordings, wherein SMSgt Doe apologized for hurting Johnson.  *Id.* ¶ 19.  The AFOSI investigators (and multiple other investigative agents) had been provided with these recordings during the initial investigation.  *Id.*  The AFOSI investigators also located a second victim who told investigators that Johnson's ex-husband had strangled her on three separate occasions during sexual intercourse and that he had threatened to harm her.  *Id.* ¶ 20.  This behavior was identical to what Johnson experienced and reported.  *Id.*  SMSgt Doe's ex-wife (prior to Johnson) also disclosed abusive behavior she endured to investigators.  *Id.*  During the initial investigation, investigators claimed that they had spoken to all of SMSgt Doe's partners, that none of these individuals confirmed any abusive behavior, and that Johnson needed to withdraw her complaint.  *Id.*

Plaintiffs allege that this information was made available to the Air Force Inspector General for his review, yet he failed to consider it.  *Id.* ¶ 21.  Despite Secretary Kendall explicitly stating that the Inspector General's review would address the prior criminal investigation and disciplinary actions, the Inspector General's report declined to include any analysis regarding Johnson's case.  *Id.*  In his review of the report in January 2023, Secretary Kendall also never considered the information regarding inculpatory audio and other victims, despite promising to do so.  *Id.*  The statute of limitations on the domestic violence offenses has since lapsed.  *Id.*

The Air Force's initial mishandling of the investigations into Johnson's domestic violence allegations took a significant toll on her mental health. *Id.* ¶ 23. The Air Force's subsequent unfulfilled overt promises made to Johnson and the purposeful omission of her allegations and evidence from the Inspector General's report greatly exacerbated her mental health issues and caused her to experience even greater emotional distress. *Id.* She became reclusive, estranged from family and friends, and was incapable of consistently working or functioning. *Id.* In addition to having a complex/chronic Post Traumatic Stress Disorder (PTSD) diagnosis, Johnson suffered, and continues to suffer, from: increased depression; increased anxiety; increased hypervigilance; increased flashbacks; increased nightmares; increased inability to focus; increased social avoidance and estrangement and inability to work in public settings; decreased sense of safety; increased loss of faith and trust, especially in male authority figures; decreased cognitive processing; and panic disorder with agoraphobia. *Id.* The Air Force's actions also impacted her physical health, such that she has suffered chronic pain, migraines, colitis, GERD, and sleep disorders. *Id.* ¶ 24. Johnson is also receiving ongoing treatment from a psychologist and therapist who specializes in Military Sexual Trama and PTSD, as well as relevant medical care. *Id.* ¶ 25. She will continue to require this care. *Id.*

### ii. Facts Specific to Plaintiff Leah Olszewski

In 2017, Plaintiff Leah Olszewski was physically, emotionally, verbally, and financially abused by her ex-partner, who was a Senior Master Sergeant in the Air Force ("SMSgt Roe"). *Id.* ¶ 26. Olszewski disclosed the verbal and emotional abuse to SMSgt Roe's commanding officer's wife and, later, the commanding officer himself. *Id.* ¶ 27. She also disclosed the abuse to two Air Force chaplains and officials within the Air Force's Family Advocacy Program and Travis Air Force Base legal office, as well as friends and acquaintances. *Id.* She also disclosed the abuse to

the local police department. *Id.* The last incident of violence occurred in October 2017; SMSgt Roe kicked Olszewski off a bed, causing her to forcefully crash into the closet door. *Id.* ¶ 28. The force of this assault caused Olszewski, who was pregnant with the couple's child at the time, to suffer a miscarriage. *Id.* She sought medical treatment with her civilian provider in October 2017 and the Air Force in November 2017. *Id.*

The AFOSI initiated an investigation in April 2018. *Id.* ¶ 29. Olszewski cooperated with the AFOSI throughout the course of their investigation, sat through hours of interviews, and provided audio evidence of her ex-boyfriend threatening to inflict seriously bodily harm on her. *Id.* The Air Force was also in possession of bodycam footage taken by the local police department (wherein Olszewski identified areas of her body that had been injured) and recordings of 911 calls made by Olszewski. *Id.* In September 2018, Olszewski learned that SMSgt Roe would not face a court-martial. *Id.* ¶ 30. The only punishment he received was administrative counseling (Letter of Reprimand) for threatening Olszewski. *Id.*

Following CBS Evening News's coverage in September 2021, AFOSI reopened Olszewski's matter. *Id.* ¶ 31. In doing so, the AFOSI notified SMSgt Roe, thereby placing Olszewski in further risk of retaliation. *Id.* Nonetheless, she cooperated, sitting through hours of additional interviews with investigators in which she again detailed the abuse she suffered. *Id.*

The supplementary AFOSI investigation revealed that at least four additional women were victims of SMSgt Roe, experiencing abuse nearly identical to what Olszewski suffered. *Id.* ¶ 32. Based upon the statements provided by these women, it appears that the Air Force was aware of his problematic behavior as early as 2008 (nearly ten years before Olszewski was abused). *Id.* Olszewski provided the AFOSI and other Air Force leadership with evidence of these other victims even prior to the supplementary investigation occurring. *Id.* The supplementary investigation also

7

revealed a pattern of toxic workplace behavior—some of which he was administratively disciplined for in the past. *Id.*

As a part of its investigation, as ordered by Secretary Kendall, the Air Force Inspector General reviewed this supplementary AFOSI investigation. *Id.* ¶ 33. However, the Inspector General's report did not discuss any of SMSgt Roe's prior victims, or the significant corroborating evidence discovered by the AFOSI. *Id.* Rather, the report focused heavily on the details surrounding Olszewski's miscarriage, her interactions with the Family Advocacy Program, and her overall credibility. *Id.* There is no indication the inculpatory evidence was ever provided to Secretary Kendall, despite Secretary Kendall explicitly promising to review this information. *Id.*

Secretary Kendall and the Air Force allowed the standard five-year statute of limitations under the Uniform Code of Military Justice to lapse. *Id.* ¶ 35. This occurred despite Olszewski emailing Secretary Kendall—prior to the five-year statute of limitations period concluding—about the impending statute of limitations, and him assuring her that it would be accounted for and not missed. *Id.*

The AFOSI also claims it cannot now provide Olszewski with recordings of her interviews with investigators because they were "lost in the mail" when sent to archives on or about January 19, 2023 (just prior to the Air Force Inspector General's report being published to Secretary Kendall, and just days before Secretary Kendall issued the All Forces Message). *Id.* ¶ 36. Two of these interviews, conducted on November 22, 2021, and March 15, 2022, were referenced in the AFOSI's supplementary report of investigation. *Id.* A third interview took place on or about September 19, 2022. *Id.* No explanation has been provided as to why recordings of these interviews were transferred to archives less than two years after they were taken and while Secretary Kendall and the Air Force Inspector General were supposedly reviewing the

circumstances surrounding the original investigation. *Id.* According to the AFOSI, all recordings collected as a part of this supplemental investigation—not just those of the interviews with Olszewski—were lost. *Id.*

The Air Force's initial mishandling of the investigations into Olszewski's domestic violence allegations took a significant toll on her mental health. *Id.* ¶ 37. The Air Force's subsequent unfulfilled promises to Olszewski, the purposeful omissions from the Inspector General's report, the loss of evidence, the disregard for the statute of limitations, and Secretary Kendall's very public use of Olszewski's case to his advantage, greatly exacerbated her mental health issues and caused her to experience even greater severe emotional distress, including increased depression; increased anxiety and panic; increased hypervigilance; increased fatigue; increased nightmares; increased inability to focus; increased social avoidance; decreased sense of safety; increased loss of faith and trust; increased cognitive dissonance; and decreased cognitive processing. *Id.* She also suffers from chronic stress-related migraines, brain lesions, insomnia, hypertension, vertigo, musculoskeletal pain, immunocompromise, and an overall decline in her fitness levels, among several other symptoms. *Id.* ¶ 38. She has been unable to work, which has negatively impacted her income, career progression, and performance. *Id.* Olszewski's personal and professional relationships have greatly suffered as the result of the trauma she continues to endure. *Id.* She has also received and continues to receive extensive and costly therapy and medical treatment, something she anticipates she will need for the rest of her life. *Id.* ¶ 39.

### iii.  Facts Specific to Plaintiff Elizabeth Knight

Plaintiff Elizabeth Knight was physically, sexually, emotionally, and financially abused by her ex-husband, who is a Chief Warrant Officer 4 in the Army ("CW4 Voe"). *Id.* ¶ 40. From about January 2017 through March 2018, CW4 Voe physically and sexually assaulted Knight,

even while she was pregnant with their son. *Id.* CW4 Voe's command was made aware of these issues, beginning with the first incident of domestic violence in January 2017. *Id.* Following the birth of their son in January 2018, it was documented in Knight's medical records that she had been physically abused. *Id.* ¶ 41. Knight was afraid to act because CW4 Voe was stationed in a foreign country, and Knight was wholly dependent on him for her and their newborn son's basic necessities. *Id.* However, in March 2018, following yet another physical assault, Knight reported the incident to military police. *Id.*

An investigation resulted in probable cause being found against CW4 Voe. *Id.* A military prosecutor informed Knight that he intended to bring charges against CW4 Voe at a court-martial for the assault and inquired whether she would testify against him. *Id.* Knight declined only because CW4 Voe threatened that she would not receive her ration card and that her Visa would be revoked, effectively leaving her homeless in a foreign country with a 5-week-old newborn infant—Knight informed the prosecutor that CW4 Voe threatened her for "going after" his career. *Id.* Knight was never informed that charges would not be brought against CW4 Voe if she did not testify; she believed the prosecutors could use the testimony she previously provided to investigators. *Id.* Ultimately, CW4 Voe received administrative counseling (Letter of Reprimand). *Id.* ¶ 43. Because the reprimand was filed in his local personnel file (and not placed in his permanent file with Army Human Resources Command), it was erased from his record upon his departure from South Korea back to an Army base in the United States. *Id.* The Army did not investigate any of the other instances of abuse, despite Knight disclosing these incidents during their investigation into the March 2018 assault. *Id.* ¶ 44.

Following CW4 Voe's return to the United States, Knight was told that local authorities did not possess jurisdiction over her domestic violence allegations because the incidents took place

10

in South Korea. *Id.* ¶ 45. Knight reached out to officials at Camp Humphreys, Korea, to inquire why the other incidents were not included in the investigation. *Id.* She was told she could report additional instances of abuse to an Air Force Base in Idaho (where she was residing at the time) because no Army base was nearby her. *Id.* Knight reported the other instances of physical and sexual abuse on or about February 25, 2019. *Id.* ¶ 46. She also elected to pursue a court-martial. *Id.* In addition to written details regarding the abuse, Knight provided evidence of the domestic violence to investigators including photos of bruising, medical records noting domestic violence within the marriage, contemporaneous text messages with a friend regarding specific incidents of abuse, and a recording of a conversation with her ex-husband discussing the sexual assault. *Id.* ¶ 47. The case was subsequently transferred back to the Army. *Id.* ¶ 48. Of her allegations of abuse (with most being physical and a few being sexual assault), the Army Criminal Investigative Division ("CID") would only investigate the allegations of sexual assault. *Id.* The CID closed the case with alleged insufficient proof of sexual assault. *Id.*

Shortly after the CBS report in September 2021, Secretary Kendall connected Knight with Former Secretary of the Army Christine Wormuth ("Secretary Wormuth"). *Id.* ¶ 49. Secretary Wormuth then emailed Knight stating that she should speak with Lieutenant General ("LTG") Donna W. Martin, the Inspector General of the Army, regarding her case. *Id.* Knight coordinated a call with LTG Martin through one of Secretary Wormuth's contacts. *Id.* During this call, which took place on November 12, 2021, LTG Martin indicated that the Army would connect Knight with a Special Victim Prosecutor ("SVP"). *Id.* ¶ 50. LTG Martin also stated that she would call Army CID which would launch a reinvestigation if Knight desired that one be completed. *Id.* Ms. Knight indicated on that call that she would like a reinvestigation. *Id.* LTG Martin further said that she would speak with the Judge Advocate General of the Army; the head of the Army's Family

11

Advocacy Program; and the Director of Army CID, Director Ford, and that Director Ford would, in turn, contact Knight.  *Id.*  LTG Martin assured Knight that her ex-husband's command would not have any influence over the Army CID or the Inspector General while the matter was being reinvestigated.  *Id.* ¶ 51.

On June 1, 2021, Secretary Wormuth announced in an All Force Message, "We must also eliminate harmful behaviors that undermine readiness. There is no place in our Army for sexual harassment and assault, [or] domestic violence."  *Id.* ¶ 53.  On February 8, 2022, Secretary Wormuth published an All Force message, stating that one of her core objectives is to reduce harmful behaviors in the Army, and that to do so, there must be a "shift from responding to harmful events after they have happened to finding ways to prevent them."  *Id.*

A CID investigation was reopened but not because of or through LTG Martin's efforts.  *Id.* ¶ 52.  In October 2022, nearly a year after LTG Martin informed Knight that she would put Knight in touch with the head of Army CID, Knight's special victims' counsel submitted a memorandum to the SVP requesting to re-open the domestic violence investigation into CW4 Voe.  *Id.*  The Army notified Knight's ex-husband of the re-investigation without Knight's knowledge.  *Id.* ¶ 54. As a result of the notification, CW4 Voe called Knight upset, and began verbally threatening her. *Id.*  Knight feared for her safety and felt as though the Army placed her in danger with no warning. *Id.*  The investigation into the March 2018 incident was not reopened, and at no point during the re-investigation did a SVP contact Knight.  *Id.* ¶ 55.

By the time a SVP finally spoke with Knight—in July 2023—the five-year statute of limitations for the act of domestic violence in March 2018 had passed.  *Id.*  During that conversation, Knight learned, for the first time, that the Army never reexamined the 2018 act of domestic violence, despite there being a prior finding of probable cause.  *Id.*  When Knight asked

whether the SVP independently reviewed the CID's findings, the SVP indicated that her office only had the ability to concur or not concur with the CID, and that the CID was the ultimate decisionmaker. *Id.*¶ 56. At no point prior to declining to take further action did the SVP request to interview Knight, nor did the SVP consider the substantiated act of domestic violence from 2018. *Id.* The SVP also declined to provide Knight an explanation as to why the CID determined there was no probable cause in the latest investigation (despite there being corroborating evidence—in the form of medical records and pictures—provided by Knight, and a prior finding of probable cause). *Id.* ¶ 57.

To gain clarity on the investigative process, Knight sought a copy of the file through the Freedom of Information Act but was unsuccessful. *Id.* ¶ 58. To date, Knight has not received any confirmation as to whether the witnesses she provided were ever contacted. *Id.* ¶ 59. None of these individuals indicated that they were contacted. *Id.*

The first time she spoke with CID Director Greg Ford was in August 2023, a month after Knight's call with the SVP, and twenty months after LTG Martin said he would contact her. *Id.* ¶ 60. During this August 2023 call, Knight asked why certain instances were either not investigated or why there was no probable cause determination. *Id.* Director Ford and his staff were unable to answer Knight's questions because they did not have a copy of her case file, despite discussion of the investigations into her allegations being the very purpose of the call. *Id.* She was told that they would obtain a copy of the case file, but no follow-up call was ever scheduled. *Id.* The entire process felt combative to Knight: Knight's special victims counsel told her at one point that it would be a conflict of interest for him to represent Knight because Knight had filed the administrative claim against the Army. *Id.* ¶ 61.

13

The Army's unfulfilled promises to Knight have taken a significant toll on her mental health issues, and caused her to experience severe emotional distress through the exacerbation of prior existing issues. *Id.* ¶ 62. Since 2021, Knight has suffered from symptoms of PTSD, including nightmares, flashbacks, paranoia, and hypervigilance. *Id.* She has also experienced physical pain in the form of chronic headaches, heart palpitations, insomnia, back and joint pain, stomach issues, flaring colitis, panic attacks, stress hives, and anxiety. *Id.* Knight has had to use leave under the Family and Medical Leave Act to address these issues. *Id.* Knight's relationships with family and friends have also suffered due to her inability to heal from the trauma. *Id.* ¶ 63. She has ongoing difficulties maintaining romantic relationships and handling conflict in her workplace as a direct result of the ongoing severe emotional distress. *Id.* Knight has been in therapy since 2021 but cannot afford the extensive cost of PTSD-specific therapy. *Id.* ¶ 64. She has lost precious time with her son as her days are consumed with pushing through the trauma and emotional distress she continues to experience. *Id.*

### B. Procedural Background

Plaintiffs filed their original Complaint on November 27, 2024, in the United States District Court for the District of Colorado. Dkt. 1. Following a Joint Motion to Transfer, the case was transferred to this District on April 16, 2025. Dkts. 9, 10.

On July 17, 2025, following transfer, Plaintiffs filed the Amended Complaint, each asserting claims for intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED"). Dkt. 24. On August 13, 2025, Defendant filed its Motion to Dismiss. Dkt. 26. On September 19, 2025, after receiving an extension, Plaintiffs filed their Opposition. Dkt. 31. On November 18, 2025, after also receiving an extension, Defendant filed its Reply. Dkt. 37.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal when the Court lacks jurisdiction over the subject matter of the action.  A district court must dismiss an action over which it lacks subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1), (h)(3).  In considering a 12(b)(1) motion to dismiss, the burden is on the plaintiff to prove that subject-matter jurisdiction is proper.  *See United States v. Hays*, 515 U.S. 737, 743 (1995) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)); *see also Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

There are two ways in which a defendant may prevail on a 12(b)(1) motion.  First, a defendant may attack the complaint on its face when the complaint "fails to allege facts upon which subject matter jurisdiction may be based."  *Adams*, 697 F.2d at 1219.  Under this method of attack, all facts as alleged by the plaintiff are assumed to be true.  *Id.*  Alternatively, a 12(b)(1) motion to dismiss may attack the existence of subject-matter jurisdiction over the case apart from the pleadings.  *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995).  In such a case, "[n]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims."  *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.3d 884, 891 (3d Cir. 1977).

## III.  ANALYSIS

In its Motion, Defendant argues that Plaintiffs' claims are barred by sovereign immunity and that Plaintiffs have otherwise failed to state a claim.  Dkt. 27.  "Sovereign immunity is jurisdictional in nature."  *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994).  Jurisdiction is a threshold requirement, so the Court addresses these arguments first.  *See Steel Co. v. Citizens for a Better*

*Env't*, 523 U.S. 83, 94-95 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" (alteration in original) (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)). Because the Court finds that it lacks jurisdiction over the action, it does not reach Defendant's remaining arguments.

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Meyer*, 510 U.S. at 475. The Federal Tort Claims Act ("FTCA") "waived the sovereign immunity of the United States for certain torts committed by federal employees." *Id.* The FTCA specifically excludes from this waiver "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Courts apply a two-pronged test to determine whether conduct qualifies for the discretionary function exception. "First, a court considers whether the challenged governmental conduct involves an element of judgment or choice." *Rich v. United States*, 811 F.3d 140, 144 (4th Cir. 2015) (citing *United States v. Gaubert*, 499 U.S. 315, 322 (1991)). When "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," there is no discretion, and the exception does not apply. *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). "Second, if the challenged conduct does involve an element of judgment, the court must then determine whether the judgment was one that the exception was designed to protect, namely, a judgment based on considerations of public policy." *Rich*, 811 F.3d at 144. When a government agent has authority to exercise discretion, the court should "'presume[ ] that the agent's acts are grounded in policy when exercising that discretion.'" *Blanco Ayala v. United States*, 982 F.3d 209, 214 (4th Cir. 2020) (quoting *Gaubert*, 499 U.S. at 324). In conducting this

16

analysis, the court considers the decision "in an objective, or general sense" to determine whether it is one "we would expect inherently to be grounded in considerations of policy," not whether the government agents involved in the case actually contemplated policy considerations in making their decisions. *Baum v. United States*, 986 F.2d 716, 721 (4th Cir. 1993).

Relevant here, the Fourth Circuit has previously recognized, "[t]he course that a military investigation takes remains a choice of the officials in charge and implicates policy considerations, making it subject to the discretionary function exception." *Blakey v. U.S.S. Iowa*, 991 F.2d 148, 153 (4th Cir. 1993); *see also* Dkt. 27-1 ¶¶ 5-6, 8; Dkt. 27-2 ¶¶ 6, 7, 10, 12. Indeed, the Fourth Circuit has repeatedly emphasized that, "[n]o one can doubt that the investigation of (potential) crimes is a discretion-laden subject." *Blankenship v. United States*, 2022 WL 1768858, at *3 (4th Cir. June 1, 2022) (quoting *Blanco Ayala*, 982 F.3d at 215); *see also id.* ("[D]iscretion infuses the process at every step," including "whether to investigate a possible violation of . . . law, how to conduct that investigation, and then whether to bring an enforcement action after drawing factual and legal conclusions.").

Here, Plaintiffs seek to hold the Government liable based on Secretary Kendall's statement to CBS (later reiterated to Plaintiffs during a phone call) that he had "directed the Department of the Air Force Inspector General to conduct a comprehensive review of [Plaintiffs'] cases," which "will address . . . the investigation and disciplinary actions associated with these cases."[2] Dkt. 24 ¶ 10. Plaintiff Knight also relies on LTG Martin's "indicat[ion]" that the Army would connect

---

[2] Plaintiffs appear to interpret this statement as an overt promise by Secretary Kendall to personally review the investigatory and disciplinary actions in Plaintiffs Johnson and Olszewski's cases. *See, e.g.*, Dkt. 24 ¶ 66 ("Air Force Secretary Kendall then made specific, overt promises to Plaintiff Johnson that he would conduct a comprehensive review of Plaintiff Johnson's case that would address the investigation and disciplinary actions."). Based on the specific quotes provided in the Amended Complaint, the Court does not find that this is a reasonable inference.

Plaintiff Knight with a SVP and statement that Army CID would launch a reinvestigation, that

LTG Martin would speak with various high-level officials, and that the Director of Army CID

would contact Plaintiff Knight.[3]  *Id.* ¶ 50.  Plaintiffs assert that the subsequent investigations did

not meet the expectations set by these statements and, thus, they were re-traumatized.  Although

the Court does not doubt the significant pain that Plaintiffs have felt and continue to feel throughout

this process, the allegations that Plaintiffs raise here challenge specific investigative and charging

decisions by the Government for which it has sovereign immunity.[4]  Plaintiffs have not identified

any statute, regulation, or policy that compels the actions whose absence they assert gives rise to

liability here, and a broad statement about directing a "comprehensive review" does not overcome

---

[3] The Court notes that—though not as soon as she thought appropriate due to the expiration of the statute of limitations for the alleged March 2018 incident—both a SVP and the CID Director eventually did contact Plaintiff Knight, and she spoke with both.  Dkt. 24 ¶¶ 55 (describing conversation with SVP), 60 ("She also never spoke with CID Director, Greg Ford—as promised by LTG Martin; the first time *she spoke with him* was in August 2023 . . . ." (emphasis added)), 91 (". . . an SVP and CID Director Ford finally contacted Ms. Knight (as was originally promised by LTG Martin nearly two years prior).").

[4] For example, Plaintiff Johnson asserts that her case should not have been "reopened" because Secretary Kendall stated that it would be "reviewed," which she understood to mean a review of the then-current file.  Dkt. 24 ¶¶ 10, 66.  Plaintiff Johnson also asserts that the investigation into her case was insufficient because—although the AFOSI reviewed inculpatory recordings and located a second alleged victim—the Inspector General's ultimate written report, which was reviewed by Secretary Kendall, did not specifically discuss the inculpatory audio evidence, the second alleged victim, and the statements made by SMSgt Doe's ex-wife. *Id.* ¶¶ 65-78.  Plaintiff Olszewski asserts that the investigation into her case was insufficient because—despite the AFOSI's hours of additional interviews and identification of additional alleged victims from as early as 2008, and review of this information by the Air Force Inspector General—the ultimate report again did not specifically discuss any of the prior victims or other corroborating evidence and focused on details about her marriage, interactions with the Family Advocacy Program, and credibility. *Id.* ¶¶ 79-88. And Plaintiff Knight asserts that the investigation into her case was insufficient because a SVP and the CID Director did not reach out to her until after the five-year statute of limitations for one of the alleged incidents of domestic violence (for which probable cause had been found at the time but for which Plaintiff Knight declined to testify in a court-martial, resulting in a sanction of only administrative counseling) had expired. *Id.* ¶¶ 89-101.

18

the Government's sovereign immunity for these discretionary and policy-laden decisions. *See Blakey*, 991 F.2d at 153; *Gray v. Bell*, 712 F.2d 490, 516 (D.C. Cir. 1983) ("We will not permit a suit for damages occasioned by activities that are not meaningfully separable from a protected discretionary function."). Accordingly, Plaintiffs' Amended Complaint must be dismissed for lack of jurisdiction.[5]

---

[5] To the extent that Plaintiffs seek damages arising out of their allegation that certain evidence was "lost in the mail," *see* Dkt. 24 ¶ 36, the FTCA also bars "[a]ny claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter," 28 U.S.C. § 2680(b); *see also Konan v. U.S.P.S.*, 607 U.S. __, 146 S. Ct. 736 (2026).

Even if this Court had jurisdiction over Plaintiffs' claims, the Amended Complaint would still be dismissed for failure to state a claim. The parties have assumed that Virginia law would apply to Plaintiffs' IIED and NIED claims, and thus the Court also so assumes without deciding. *See* Dkt. 9 at 2-3; Dkt. 27 at 17. To state a claim for IIED, a plaintiff must sufficiently allege conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Russo v. White*, 241 Va. 23, 27 (1991). Here, Plaintiffs allege clearly outrageous, intolerable behavior by their former partners. But, as alleged, the actions of the Government in reopening and further investigating their cases against those partners, *see supra* note 3, do not meet this high bar. Moreover, to state a claim for NIED, a plaintiff must sufficiently allege "(1) that the defendant was negligent, (2) that the negligence caused emotional distress, and (3) that the emotional distress caused symptoms and manifestations of physical injury." *Elrod v. Busch Ent. Corp.*, 2010 WL 11701146, at *2 (E.D. Va. May 7, 2010). "The standard for negligent infliction of emotional distress is even more rigorous than the standard for intentional infliction of emotional distress." *Michael v. Sentara Health Sys.*, 939 F. Supp. 1220, 1234 (E.D. Va. 1996). Based on the allegations in the Amended Complaint, Plaintiffs have also failed to state a claim under this standard.

19

IV.  CONCLUSION

It is unfortunate that Plaintiffs were retraumatized in their quest for justice.  But not all wrongs have an available remedy, particularly where the alleged wrongdoer is the federal government.  Accordingly, for the foregoing reasons, it is hereby ORDERED that Defendant's Motion to Dismiss (Dkt. 26) is GRANTED; and it is

FURTHER ORDERED that the action is DISMISSED WITHOUT PREJUDICE for lack of subject-matter jurisdiction.

The Clerk is directed to place this matter among the ended causes.

It is SO ORDERED.

Alexandria, Virginia
March 20, 2026

_____ /s/
Rossie D. Alston, Jr.
United States District Judge

20